IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>Dennis Raymond McPherron,<br><br>    Defendant. | CR 17-00242-TUC-JAS (EJM)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is the government's Motion in Limine to preclude the defense from introducing certain evidence at the bench trial set before the District Court on October 29, 2019. (Doc. 50.)  Pursuant to LRCrim. 5.1, this matter was referred to the assigned Magistrate Judge for a Report and Recommendation.   For the reasons set forth below, it is recommended that the District Court deny the government's Motion in Limine.

### FACTUAL BACKGROUND

The defendant, Dennis Raymond McPherron, is charged in an Indictment with Smuggling Goods into the United States, in violation of 18 U.S.C. § 545.  Specifically, the Indictment alleges that on or about February 17, 2016, at the Mariposa Port of Entry, the defendant:

> did willfully, knowingly and fraudulently import and bring into the United States certain merchandise, that is, various bald eagle feathers contrary to law that is, the Bald and Golden Eagle Protection Act under Title 16 United States Code Section 668, knowing the same to have been imported and brought into the United States contrary to law.

[Doc. 1.]

The government filed a Motion in Limine which seeks to prevent the defendant from introducing any evidence relating to: (1) Native American Tribes; (2) Native American Tribal

1  membership; (3) Native American religious customs, practices, and ceremonies; and (4) the religious
2  and historical significance of bald and golden eagle feathers to any said Native American religious
3  custom, practice, and ceremony.  (Doc. 50.)   The government argues that the foregoing evidence
4  is irrelevant to the charged offense, and therefore, the defense should be precluded from introducing
5  any of this evidence at trial.  The defense argues that the exclusion of this evidence would violate
6  his First Amendment and due process rights under the United States Constitution. (Doc. 53.)  The
7  defense also argues that the instant offense requires the government to prove the defendant's specific
8  intent to violate the law, and the proffered evidence shows that the defendant did not have that
9  requisite intent. (Doc. 70.)

10         An evidentiary hearing on the Motion in Limine was held on August 9, 2019.  The
11 government called Tamara Kurey, a Special Agent with the U.S. Fish and Wildlife Service, and the
12 defense called Mr. McPherron.  Their testimony is summarized below.

13         Agent Kurey testified as follows on direct examination.  Agent Kurey has been a Special
14 Agent with the Fish and Wildlife Service for eleven years.  (Transcript of Proceedings,
15 Evidentiary Hearing, held 8/9/19, at 13-14.)  She was previously a Special Agent with the FBI
16 for three-and-a-half years.  (*Id*. at 14.)  Her duties in her current position are to investigate wildlife
17 crimes, such as trafficking of wildlife, Endangered Species Act violations,  Lacey Act violations,
18 and Migatory Bird Treaty Act violations.  (*Id*.) She has also dealt with violations of 18 U.S.C. 545,
19 the charge in the instant case.   (*Id*.)

20         Agent Kurey testified to the events of February 17, 2016.  On that day, she received a call
21 from Tracey Tilley, a Customs and Border Protection Agriculture Specialist, who advised her that
22 the defendant did not declare certain feathers when entering the United States from Mexico.  (*Id*. at
23 15, 20-21).   Ms. Tilley advised that the defendant gave two negative declarations when asked if he
24 had anything to declare, such as plants, animals, and food.  (*Id*. at 15.)   The defendant and his
25 traveling companion were asked to exit the vehicle while agricultural specialists inspected the
26 defendant's vehicle.  (*Id*. at 16.) The defendant was sent to the secondary inspection area while the
27 search was being conducted.  (*Id*. at 18.)  At secondary, the defendant was again asked if he had
28 any plants to declare, and he responded that he did not have any fresh plants but "he had some herbs,

1  including moringa and peyote." (*Id*. at 19.)   The defendant also added that he had ammunition in
2  the vehicle.  (*Id*. at 19-20.)

3   During the search of the bed of the defendant's truck, the agricultural specialists found a
4  wooden box containing ceremonial-type items, as well as bird feathers. (*Id*. at 20-21, 24.)   In total,
5  over 220 feathers, some of which were from bald and golden eagles, were found in the bed of the
6  defendant's truck.  (*Id*.)  Some of the feathers were in the wooden box, some were in a Federal
7  Express box, and some were in trash bags.  (*Id*. at  24.)    Agent Kurey testified that the defendant
8  did not declare any of the feathers, and refused to sign a form indicating that he was willing to
9  abandon any claim to the feathers. (*Id*. at 22-23.)   The defendant told the agricultural specialists
10 that he comes back and forth between Mexico and the United States all the time.  (*Id*. at 26-27.)
11 Agent Kurey testified that people entering the United States are always asked to declare agricultural
12 products.   (*Id*. at 26.)

13   Agent Kurey's testimony turned to who can lawfully possess bald and golden eagle feathers.
14 (*Id*. at 27.) She testified that only members of federally recognized tribes can lawfully possess these
15 types of feathers.  (*Id*.) She explained that the United States has an interest in regulating the
16 possession of these feathers based on the decline of the species in the past and to prevent the decline
17 of those species again. (*Id*. at 27-28.)   She further explained that the United States does provide
18 bald and golden eagle feathers to federally recognized tribal members for their religious ceremonies
19 and practices.  (*Id*. at 27.)    Native Americans may give eagle feathers as gifts to other Native
20 Americans and may hand them down within their families. (*Id*. at 28.)   However, a non-Native
21 American is not able to receive bald or golden eagle feathers from a Native American.  (*Id*. at 28-
22 29.)   That is because non-Native Americans are not able to possess bald and golden eagle feathers.
23 (*Id*. at  28.)

24   Agent Kurey's testimony then turned to some other items found in the defendant's truck.
25 The defendant was in possession of a card that says that he is a member of the "Native American
26 Church"in Nevada, and also references the Sho-Ban tribe. (*Id*. at 30; Ex. 4.)   Agent Kurey testified
27 that the Sho-Ban Tribe confirmed that the defendant is not a member of that tribe.  (*Id*;  Ex. 2.) She
28 also testified that the "Native American Church" is not a federally recognized tribe. (*Id*. at 32.)   The

1    Tuscarora Nation also confirmed that the defendant is not a member. (*Id*. at 31; Ex. 8.)

2        Agent Kurey testified that she has worked on other cases where individuals have tried to
3    enter the United States with feathers. (*Id*.)  The non-Native American individuals usually abandon
4    the feathers and there is no further investigation. (*Id*.)  The Native American individuals frequently
5    call before they exit or enter the United States "to find out either what the requirements are or just
6    to notify us that they're traveling for ceremonial reasons and members of their tribe will be bringing
7    feathers in and out of the country, and so we are expecting them when they show up." (*Id*. at 31-
8    32.) And Native Americans often have a document or letter reflecting that they are a member of a
9    tribe. (*Id*. at 32.)

10        Agent Kurey was asked if a Native American can just go out and get feathers.  She
11   explained that "[t]here are some instances where that is allowed, to pick up feathers that have been
12   naturally molted." (*Id*. at 33.)  But there is a permit process afforded to Native American tribes to
13   obtain feathers from the National Eagle Repository which is operated by the federal government.
14   (*Id*.)  All bald and golden eagles that the U.S. Fish and Wildlife Service obtains – whether they are
15   roadkill, electrocuted, or die from natural causes – are sent to this repository which is located near
16   Denver, Colorado. (*Id*.)  The employees at the repository clean the eagles, strip their feathers, and
17   categorize the feathers. (*Id*. at 33-34.)   Members of federally recognized tribes can go online or
18   contact their nearest Fish and Wildlife Service office to fill out an application for feathers, listing
19   the type and age of the eagle feathers that they want. (*Id*. at 34.)  Along with their application, the
20   applicant must submit a certification of their tribal enrollment that they get from the Bureau of
21   Indian Affairs. (*Id*.)  There is a waiting list for eagle feathers and the wait can be more than a year.
22    (*Id*.)  Finally, Agent Kurey addressed "the Morton Policy," which essentially provides that legal
23   action will not be taken against Native Americans who are members of a federally recognized tribe
24   and who possess or use feathers that were not obtained via the permitting process. (*Id*. at 36-37.)

25        On cross-examination, defense counsel questioned Agent Kurey about the location
26   of the feathers within the bed of the defendant's truck. (*Id*. at 38.)  Agent Kurey conceded
27   that she is not suggesting that the defendant deliberately hid the feathers. (*Id*.) Agent Kurey
28   acknowledged that the defendant told law enforcement that he had crossed the border

numerous times with the feathers. (*Id*. at 40.)  She testified that she ordered border crossing records for the defendant because she thought that was important, but she was never provided with those records. (*Id*.) Agent Kurey agreed that the defendant never claimed to be a member of a recognized tribe. (*Id*. at 42.)  He said that he was a member of and a shaman for the Native American Church and possessed a card that reflected his membership. (*Id*. at 42-43.)   The defendant did not tell the inspectors on February 17, 2016, where he obtained the feathers. (*Id*. at 43.) However, he later provided Agent Kurey with a letter from a spokesperson from the Native American Church which stated that the defendant was given the feathers forty years ago. (*Id*. at 43-44.)   She testified that the Native Americans who gave the defendant the feathers were also breaking the law. (*Id*. at 50.)

Agent Kurey did not do any follow-up investigation about the people the defendant visited in Mexico on or about February 17, 2016, and did not ask the defendant where he went in Mexico or if he had ever crossed into Canada. (*Id*. at 44.)   Her only knowledge about the Native American Church comes from what she read on their website. (*Id*. at 46-48.)

Agent Kurey has been personally been involved with three cases involving the seizure of bald and golden eagle feathers. (*Id*. at 51.)  None of those cases went to court because the feathers were abandoned by the persons who possessed them. (*Id*.) Agent Kurey testified that those three individuals were not prosecuted because they declared the feathers. (*Id*. at 52.)

On re-direct examination, Agent Kurey again testified that the defendant gave two negative declarations when asked if he was bringing plants or animals into the United States, and was given an opportunity to declare the feathers but did not do so.  (*Id*. at 56.)  She also again testified to where the feathers were found in the defendant's truck – in the wooden box, in the Federal Express box, and in trash bags.  (*Id*. at 58.)  She again confirmed that the defendant is not a member of a recognized tribe and that the Native American Church is not a recognized tribe. (*Id*. at 60.)  As to the three other cases where she encountered individuals with eagle feathers, she testified that the individuals were not Native American, but they did not smuggle the feathers. (*Id*. at 61.) She further testified that they "just didn't realize they couldn't have them" and they abandoned them. (*Id*.).

1    In response to the Court's inquiry, Agent Kurey testified that the federal government keeps
2    records of who they issue permits for the possession of eagle feathers. (*Id*. at 62.) Agent Kurey did
3    not check to see if the defendant was never issued a permit because he is not Native American. (*Id*.)
4    She testified that it is impossible to get a permit if you are not Native American. (*Id*. at 63.) In
5    response to another inquiry from the Court, Agent Kurey testified that if you are Native American
6    and possess an eagle feather without a permit, then you would not be prosecuted as a result of the
7    Morton policy. (*Id*.) In response to final inquiry from the Court, Agent Kurey testified that if you
8    are not Native American and you find an eagle feather while hiking, for instance, technically you
9    are violating the law by possessing the feather. (*Id*. at 64.)

10   The defendant, Dennis Raymond McPherron, testified as follows on direct examination.
11   Mr. McPherron is 74 years old and resides in Hamilton, Montana. (*Id*. at 66.) He has been "a full-
12   time healer, medicine man, for 40 years." (*Id*. at 67.) He has been a member of the Native
13   American Church, which is associated with the Washoe Tribe, for 40 years. (*Id*. at 67-68.) He
14   explained that you do not have to be Native American to be a member of this church, and that he is
15   not Native American. (*Id*. at 68, 76.) The eagle feathers that he had in his possession on July 17,
16   2016, were given to him 35 to 40 years ago by members of the Cherokee Tribe and the Arapahoe
17   Tribe. (*Id*. at 69-72.) Mr. McPherron has taken the eagle feathers out of the country to Mexico
18   approximately 15-20 times and to Canada about three times. (*Id*. at 72-73) He was never told that
19   he had to declare the feathers when either leaving or entering the United States. (*Id*. at 73.)

20   On July 17, 2016, he was returning to the United States after performing prayer services and
21   healing ceremonies in Mexico for three days. (*Id*. at 74.) McPherron testified that he was not a
22   member of a tribe on July 17, 2016 and never claimed to law enforcement at the Port of Entry that
23   he was a member of a tribe. (*Id*. at 76.) He had no idea that he needed permits to take eagle feathers
24   out of or into the United States. (*Id*. at 77.) None of the tribal elders, any other healers, or any tribal
25   members ever told him that he needed a permit. (*Id*.) He reiterated that he took the feathers into
26   Mexico to be used for religious ceremonies. (*Id*.) He testified that he did not hide the feathers in
27   the bed of his truck; they were "strategically placed at the tailgate" so they would not bounce around
28   and get damaged. (*Id*. at 77-78.) When he has crossed into the United States from Mexico through

1    Eagle Pass, Texas, he had been told that if you bring something from the United States back to the
2    United States, you do not need to declare it.  (*Id*. at 79.)   He was also told that at a Port of Entry in
3    Arizona, but that was not at the Nogales Port of Entry.  (*Id*.)   He testified that it never crossed his
4    mind to declare the feathers when he left the United States and returned; he declared the peyote and
5    ammunition so he knew he was going to be searched.  (*Id*. at 80.)

6         Mr. McPherron testified that he told the agents at the Port of Entry that he was not going to
7    give up his feathers.  (*Id*. at 77.)   He wrote a letter to the prosecutor in which he explained that the
8    feathers are designated to travel through his bloodline and requested that the feathers be returned.
9    (*Id*.)

10        On cross-examination, the defendant conceded that he understood the criminal charge
11   against him, but he would not agree that this was not about his religious beliefs.  (*Id*. at 85.) He also
12   conceded that he is not a member of any Native American tribe.  (*Id*. at 86.)   However, he claims
13   he has been adopted into the Tuscarora Nation and does not understand why the letter from that tribe
14   states that he is not a member.  (*Id*.; Ex. 8.)   He generally agreed with the prosecutor that when he
15   has entered the United States on prior occasions he is asked if he has items to declare.  (*Id*. at 88-89.)
16   However, he again testified that Port Inspectors advised him that he did not have to declare items
17   that he brought from the United States when returning to the United States. (*Id*. at 89.)   Mr.
18   McPherron agreed that the feathers are important to him because he considers them to be "sacred"
19   or "holy."  (*Id*. at 91.)   He testified that he was unfamiliar with the permit process to obtain eagle
20   feathers and that he did not have a permit.  (*Id*. at 92.)

21        During oral argument on the Motion in Limine, the Court asked the parties whether the
22   charged offense is a specific intent crime.  The Court made this inquiry because the indictment uses
23   the *mens rea* of "willfully."   The Court requested the parties to submit memoranda addressing
24   whether the instant offense is a specific intent crime and how the requisite intent impacts the Motion
25   in Limine in light of the testimony presented at the evidentiary hearing.   Neither party has submitted
26   a post-hearing memorandum.

27                                          **DISCUSSION**
28        Title 18, United States Code, Section 545 provides as follows:

> Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or
>
> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law–
>
> Shall be fined under this title or imprisoned not more than 20 years, or both.

The Ninth Circuit has held that 18 U.S.C. § 545 provides for two separate criminal offenses with different mental states for smuggling goods into the United States. *See United States v. Davis*, 597 F.2d 1237 (9th Cir. 1979) ("We have recognized that the two paragraphs of [section] 545 set forth two separate offenses."). For an offense charged under paragraph one of section 545, specific intent must be proven by the government. *United States v. Smith*, 714 Fed. Appx. 701 (9th Cir. 2017) ("'Fraudulently' importing unlawful merchandise – doing so with the intent to defraud – requires specific intent[.]")  By contrast, for an offense charged under paragraph two, the government is not required to prove as an element of an offense that the defendant "specifically intended to defraud the Government." *Davis*, 597 F.2d at 1239.

In *Davis*, the Ninth Circuit approved the jury instructions given by the District Court in a section 545 prosecution based on paragraph two of that statute where the *mens rea* was knowingly. *Id.* The District Court instructed the jury as follows:

> An act is done knowingly if it is done voluntarily and intentionally and not because of mistake or inadvertence or accident or other innocent reason.
>
> Three elements are required to be proved beyond a reasonable doubt in order to establish the offense charged in the indictment.
>
> 1. That the merchandise was imported into the United States from Mexico as charged;
> 2. That this importation was contrary to law; and,
> 3. That the defendant knowingly accomplished the importation.

*Id.* at 1238.

The defendant in *Davis* proposed a jury instruction which "in effect, would have added to the third element of the trial court's instruction the words: 'with the specific intent to defraud the United States Government.'" *Id.* The Ninth Circuit concluded that the District Court correctly

1   refused to instruct the jury in that manner because the "second paragraph of [section] 545 under
2   which [the defendant] was charged is written in the disjunctive, requiring proof that an accused
3   either 'knowingly' or 'fraudulently' import merchandise in violation of the law." *Id.* at 1239. The
4   Ninth Circuit held that "[b]y its own clear terms, [section] 545 (second paragraph) does not require
5   proof of both a knowing and fraudulent element." *Id.*  The court reasoned that the defense's
6   proposed instruction read "into the offense charged under the second paragraph of [section] 545 an
7   element expressly included within the first paragraph of that statute." *Id.*  Accordingly, the
8   government was not required to prove that the defendant specifically intended to defraud the
9   government. *Id.*

10      In the case at hand, the Indictment combines the *mens rea* of paragraph one of section 545
11  (*i.e.*, willfully) while otherwise tracking the language of the second paragraph of section 545.
12  Ironically, the government has done what the defense improperly sought to do in *Davis*.  The
13  government argues that it charges in the conjunctive and proves in the disjunctive.  However, that
14  explanation fails when the government charges (in the conjunctive) a *mens rea* that does not appear
15  in paragraph two of section 545.  Again, as explained in *Davis*, under paragraph two of section 545,
16  the *mens rea* is either fraudulently or knowingly, and not willfully.  The issue of whether the
17  Indictment validly charges an offense under section 545 is not currently before this Court.  However,
18  assuming the Indictment validly charges an offense, the government will certainly have to pick
19  which theory, and as a result, the requisite *mens rea* it plans to proceed with at trial.  That said, the
20  Court concludes that even if the applicable *mens rea* is "knowingly," thus making the offense a
21  general intent crime, the Court still believes the proffered evidence should be admissible at trial.

22      As the Court in *Davis* explained, an act is not done knowingly if it was the result of mistake,
23  inadvertence, accident, or some other innocent reason. *Id.* at 1239-1240.  In the case at hand, the
24  defendant plans to argue that his actions were motivated by inadvertence, accident, or some other
25  innocent reason; specifically, his repeated crossings into the United States from Mexico with eagle
26  feathers without having to declare these items.  Evidence regarding the defendant's use of the
27  feathers for religious or healing ceremonies in Mexico merely provides context for the border
28  crossings to support this potential defense.  Moreover, since the instant matter is set for a bench trial,

there is no issue as to jury confusion about the relevance or weight to afford to the proffered evidence.

Accordingly, it is recommended that the District Court deny the government's Motion in Limine.

Pursuant to 28 U.S.C. § 636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR 17-00242-TUC-JAS.**

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

DATED this 27th day of September, 2019.

_Eric J. Markovich_
Eric J. Markovich
United States Magistrate Judge